1  Kevin D. Lally (SBN 095374)
   Edward Romero (SBN 148495)
2  GREENAN, PEFFER, SALLANDER & LALLY LLP
   Post Office Box 10
3  6111 Bollinger Canyon Road, Suite 500
   San Ramon, California  94583
4  Telephone:  (925) 866-1000
   Facsimile:  (925) 830-8787
5  Email:  Eromero@gpsllp.com

6  Mary McNamara (SBN 147131)
   August Gugelmann (SBN 240544)
7  SWANSON, McNAMARA & HALLER LLP
   300 Montgomery Street, Suite 1100
8  San Francisco, California  94104
   Telephone:  (415) 477-3800
9  Facsimile:  (415) 477-9010
   Email:  MMcnamara@SMHlegal.com

10

11 Attorneys for Plaintiffs
   MASSIMILIANO MARTONE and
12 MARTONE RADIO TECHNOLOGY, INC.

13              UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15 MASSIMILIANO MARTONE, an individual;    Case No. CV 08 2379
   MARTONE RADIO TECHNOLOGY, INC., a)
16 Nevada Corporation,                    )  COMPLAINT FOR:
                                          )  1. Violation of the Computer Fraud and
17              Plaintiffs,               )     Abuse Act, *18 U.S.C. section 1030 et seq.;*
                                          )  2. Violation of the California Uniform
18        vs.                             )     Trade Secrets Act, *Cal. Civ. Code section*
                                          )     *3426 et seq.;*
19 DAVID BURGESS, an individual; KESTREL )  3. Common Law Misappropriation of
   SIGNAL PROCESSING, INC., a California )     Trade Secret;
20 Corporation; and RANGE NETWORKS,      )  4. Fraud and Deceit;
   INC.,                                  )  5. Breach of Contract;
21                                        )  6. Breach of the Covenant of Good Faith
              Defendants.                 )     and Fair Dealing;
22                                        )  7. Violation of Unfair Competition Law,
                                          )     *Cal. Bus. & Prof. Code section 17200 et*
23                                        )     *seq.;*
                                          )  8. Unjust Enrichment;
24                                        )  9. Declaratory Relief; and
                                          )  10. Injunctive Relief
25                                        )
                                          )  JURY TRIAL DEMANDED
26 _____)

27        Plaintiffs Massimiliano Martone and Martone Radio Technology, Inc. complain against

28 defendants David Burgess, Kestrel Signal Processing, Inc. and Range Networks, Inc. as follows:

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

# INTRODUCTION

1.    This action arises from the theft of plaintiffs' intellectual property.  Plaintiff Massimiliano Martone ("Martone") holds a doctorate in electronic engineering and has worked in the field of digital wireless communications for over seventeen years.  Martone is also the founder, president, chief executive officer and shareholder of plaintiff Martone Radio Technology, Inc. ("MRT"), which was formed in the State of Nevada in 2004.  MRT designs, develops and supplies high-performance wireless transceivers and geo-location devices to customers worldwide and to the defense and intelligence agencies of the United States.  MRT is involved in supporting many sensitive intelligence missions on behalf of the United States government and the devices produced by MRT are subject to the Arms Export Control Act, 22 U.S.C. section 2751 *et seq*. (the "Export Control Act").

2.    Among the devices which MRT supplies to its customers is a portable base station transceiver ("BTS") for cellular communications.  The BTS developed by MRT (the "MRT-BTS") is a device that is used in situations requiring high performance and high precision in the processing of radio frequency ("RF") and digital signals and network control.  The MRT-BTS is a, portable transmitter and receiver that relies on both software and hardware that was conceived, designed and developed by Martone and MRT.  The MRT-BTS has unique features and performances which are based on Martone's theoretical knowledge of electromagnetic propagation and signal processing.  Martone and MRT have invested millions of dollars in developing the technology in the MRT-BTS.

3.    From September 2004 until approximately August 2005, Martone retained defendant David A. Burgess ("Burgess") to develop software for specific aspects of the MRT-BTS.  In or about August 2005, Burgess formed defendant Kestrel Signal Processing, Inc. ("Kestrel") which is a California corporation.  Following its formation, Burgess performed his consulting services to plaintiffs through Kestrel.

4.    To enable him to perform his duties, Burgess, and later Kestrel, were given access to the databases of MRT's computers.  These databases contain the proprietary software and algorithms of the company.  The computers of MRT are used in interstate and foreign commerce

1  and communication. Burgess was also provided hardware that was developed by MRT.

2      5.    Pursuant to a written agreement signed by Burgess, he and his company are

3  obligated to preserve and protect the intellectual property of plaintiffs. Burgess and Kestrel are

4  further obligated to use plaintiffs' intellectual property only for the development of the MRT-

5  BTS. The proprietary agreement refers to this work, and the other consulting work performed by

6  Burgess, as the "GSM Project."

7      6.    Notwithstanding their obligations to Martone and MRT, Burgess and Kestrel have

8  stolen plaintiffs' trade secrets and intellectual property by, among other things, accessing the

9  computers and servers of MRT and downloading software, source code and other intellectual

10  property which neither Burgess nor Kestrel needed to perform their work.

11      7.    Martone and MRT are informed and believe that that intellectual property which

12  Burgess and Kestrel stole from plaintiffs is being used to create a device similar in form, content

13  and function to the MRT-BTS. In fact, Burgess has stated that he and others formed defendant

14  Range Networks, Inc. ("Range"), for the purpose of developing and marketing a BTS device that

15  is based on the same technical standards and performs the same functions as the MRT-BTS.

16      8.    Additionally, Burgess has disclosed, and has attempted to disclose, the trade

17  secrets and intellectual property of Martone and MRT to others, including, *inter alia*, Range.

18      9.    Accordingly, Martone and MRT bring this action for violation of the Computer

19  Fraud and Abuse Act, 18 U.S.C. section 1030 *et seq.*; violation of the California Uniform Trade

20  Secrets Act, Cal. Civ. Code section 3426 *et seq.*; fraud and deceit, breach of contract; breach of

21  the covenant of good faith and fair dealing; violation of the Unfair Competition Law, Cal.

22  Business & Profession Code section 17200 *et seq.*; and Declaratory Relief and Injunctive Relief.

23          **THE PARTIES**

24      10.    Plaintiff Massimiliano Martone is an individual who resides in this judicial

25  district. At all times herein, Martone was the president, chief executive officer and shareholder

26  of plaintiff Martone Radio Technology, Inc.

27      11.    Plaintiff Martone Radio Technology, Inc. ("MRT") is a corporation that is formed

28  and organized under the laws of the State of Nevada. Its principal place of business is located in

Greenan,
Peffer,
Sallander &
Lally LLP

3

1    San Ramon, Contra Costa County, California.

2        12.    Defendant David A. Burgess is an individual.  While serving as a software

3    consultant to plaintiffs, Burgess performed his work, *inter alia*, at the principal place of business

4    of MRT in San Ramon, Contra Costa County.

5        13.    Defendant Kestrel Signal Processing, Inc. ("Kestrel") is a corporation.  Plaintiffs

6    are informed and believe that Kestrel is formed under the laws of the State of California and that

7    its principal place of business is located at 2253 Fox Glen Drive, Fairfield, California.  Plaintiffs

8    are further informed and believe that Burgess is a shareholder and director of Kestrel and serves,

9    or has served, as its chief executive officer.

10       14.    Defendant Range Networks, Inc. ("Range") is a corporation.  Plaintiffs are

11   informed and believe that Range is formed under the laws of the State of California and its

12   principal place of business is located at 1652 West Texas Street, Fairfield, California.  Plaintiffs

13   are informed and believe that Burgess is a shareholder and director of Range.

14                         **SUBJECT MATTER JURISDICTION**

15       15.    Subject matter jurisdiction over this action is conferred on this Court by 28 U.S.C.

16   section 1331 and 18 U.S.C. section 1030(g), a provision of the Computer Fraud and Abuse Act,

17   18 U.S.C. section 1030 *et seq.*

18       16.    Subject matter jurisdiction is also conferred on this Court by 28 U.S.C section

19   1367(a) ("Supplemental Jurisdiction").

20               **VENUE AND INTRADISTRICT ASSIGNMENT**

21       17.    Venue in this judicial district is proper pursuant to 28 U.S.C. section 1391

22   because the events giving rise to the claims for relief alleged herein occurred in this judicial

23   district.  Pursuant to Civil Local Rule 3-2(d), assignment of this action to the San

24   Francisco/Oakland Division of the Northern District is proper because this action arises in

25   Contra Costa County, California.

26

27

28

**ALLEGATIONS**

**A.    Massimiliano Martone.**

18.    Martone received his doctorate in Electronic Engineering from the University of Rome in 1990. Since then, Martone has spent more than 17 years working in the field of digital, wireless communications.

**B.    Martone Radio Technology, Inc.**

19.    In 2004, Martone formed MRT in the State of Nevada and the company became active in July 2005. MRT designs, develops and supplies high-performance wireless transceivers and geo-location devices to commercial customers and to defense and intelligence agencies of the United States. MRT is also involved in supporting many sensitive missions on behalf of the United States government and the devices produced by MRT are subject to the Export Control Act.

20.    Among the devices which MRT designed, developed and supplies to its customers is a portable base station transceiver ("BTS") for cellular communications. The BTS developed by MRT (the "MRT-BTS") is a device that is used in situations requiring high performance and high precision in the processing of radio frequency ("RF"), digital signals and network control. The MRT-BTS is a high-performance, portable transmitter and receiver that relies on both software and hardware that was conceived, designed and developed by Martone and MRT. The MRT-BTS has unique features and performance. These advantages come from Martone's theoretical knowledge of electromagnetic propagation and signal processing. Although the MRT-BTS is designed to function on cellular networks using a standardized protocol that is known as the Global Standard for Mobile ("GSM"), the proprietary software and hardware developed by MRT can be applied to other cellular standards.

21.    MRT has invested millions of dollars in developing the technology used in the MRT-BTS.

22.    Martone and MRT have also designed, developed and supply other devices to its customers. Plaintiffs also provide technological analyses and services to its clients, including, *inter alia*, technology which permits the "mapping" and "surveying" of terrain in which cellular

Greenan,
Peffer,
Sallander &
Lally LLP

5

1  telephone calls are transmitted and received.

2  **C.    The Retention of David Burgess and Kestrel.**

3      23.    In or about September 2004, Martone retained Burgess to serve as a software

4  consultant.  Before engaging in his work, Burgess entered into a written contract entitled

5  "Proprietary Information Agreement," which is dated September 28, 2004 (the "Proprietary

6  Agreement").  A copy of the Proprietary Agreement is attached as Exhibit 1 and its terms are

7  incorporated by reference in this complaint.

8      24.    Paragraph 4 of the Proprietary Agreement provides that only Burgess, or a

9  substitute designated in writing, could access to plaintiffs' intellectual property.

10     25.    The Proprietary Agreement also contains a written addendum (the "Addendum").

11 In it, Burgess agrees that "Martone will be the owner of all inventions, technology, designs,

12 algorithms, work of authorship, mask works, technical information, computer software, business

13 information, and other information conceived, developed or otherwise generated" by the work

14 performed Burgess.  In the Addendum, Burgess further agreed "not to use Martone-provided

15 information for any purpose except to perform contract work related to the GSM project."

16 Burgess further agreed in the Addendum to "assist Martone at Martone's request and expense, in

17 obtaining, maintaining and enforcing patent and other intellectual property protection."

18     26.    Burgess agreed to the conditions of the Proprietary Agreement and Addendum

19 and thereafter formed Kestrel, through which he performed work for Martone and MRT until

20 approximately October 2007.

21     27.    Plaintiffs are informed and believe that Harvind Samra ("Samra") is a director of

22 Kestrel and serves as its secretary and chief financial officer.

23     28.    Among the tasks which Burgess performed for plaintiffs was the development of

24 specific software for the MRT-BTS.  The Proprietary Agreement refers to this work, and the

25 other work performed by Burgess, as the GSM Project.

26     29.    To enable him to do his work, plaintiffs provided Burgess access to the MRT

27 software repository which contains all of the source code, algorithms and software developed by

28 Martone and MRT.

Greenan,
Peffer,
Sallander &
Lally LLP

6

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

30.     Copies of the MRT software used by Burgess, including algorithms, were also stored in the laptop computer which MRT provided to Burgess.  Burgess also had access to the servers and computers of MRT which are used in interstate and international commerce and communication.

31.     Burgess was also provided with hardware developed by MRT.  The hardware included an MRT-BTS and two global position system ("GPS") receivers that were part of the MRT-BTS system.

**D.     Development of the MRT-BTS.**

32.     MRT began developing its BTS in or about September 2005.  The development of this device was "from scratch," which means that it did not involve the use of "off-the-shelf" or commercially available third party software or hardware.  Rather, the software, algorithms and hardware for the device were designed and developed by MRT.

33.     Burgess was assigned the responsibility of writing portions of the software for the MRT-BTS.  As part of the process, MRT instructed Burgess to draft a document regarding the software to be used in the device.  The drafting of this document exposed Burgess to the engineering architecture of the MRT-BTS, its functional hardware and software partitioning and the algorithms to be used in the product.

34.     Following the drafting of the document, Burgess was assigned the responsibility of working on several components of the software to be used in the MRT-BTS.  Among the software that Burgess, through Kestrel, worked on was the "core" of the MRT-BTS.  Burgess worked on the software to be used in the MRT-BTS from approximately September 2005 to March 2007.

35.     MRT produced a working BTS in or about the spring of 2007.

**E.     The Conduct of Burgess Following Development of the MRT-BTS.**

36.     After MRT developed a working BTS, Burgess became interested in various aspects of the project for which he had not been retained.  One interest was in the voice processing aspect of the MRT-BTS.  This aspect enables cellular telephone calls to take place without the need for cell phone towers and the infrastructure required to support them.

1    37.    As a result, Burgess requested that his consulting work be expanded to include

2    work on the voice processing aspect of the MRT-BTS.  Burgess was eventually charged with

3    developing further software for the voice processing aspect of the MRT-BTS.

4    38.    During the period after MRT produced a working BTS, Burgess was seen or

5    heard engaging in the following conduct:

6    **i.    Photographing Commercially Sensitive Areas of MRT.**

7    39.    In the spring of 2007, Martone witnessed Burgess photographing the hardware

8    laboratory of MRT with his cell phone.

9    40.    Additionally, in or about May 2007, the business manager for MRT saw Burgess

10    taking photographs of the software laboratory of MRT.

11    41.    Plaintiffs have never authorized Burgess to photograph any of their products or

12    devices.

13    **ii.    Reviewing Commercially Sensitive Documents in the Office of Martone.**

14    42.    In August 2007, Martone saw Burgess reading documents on a table located at the

15    center of Martone's office.  Burgess did so even though Martone was not in his office nor had he

16    invited Burgess into the office.  Among the documents which Burgess was reviewing were

17    shipping records containing the names and addresses of customers who had purchased MRT

18    products, including the MRT-BTS.  Burgess was not authorized to review any of these materials.

19    **iii.    Questioning Employees About MRT Technology Unrelated To His Work.**

20    43.    In September 2007, Burgess questioned two MRT employees, John Youden

21    ("Youden") and Ken Ng ("Ng"), about the cost of a device loaned to MRT by the United States

22    Government.  Such devices are commonly referred to as government furnished equipment

23    ("GFE").  The device which Burgess was interested in mimics the behavior of a cellular network

24    and is not readily available for sale in the marketplace.

25    44.    Burgess also quizzed Youden in September 2007 about technological issues

26    relating to "power amplifiers," and the "range" of MRT equipment and components of the MRT-

27    BTS.  Among other things, Burgess wanted to know the power at which certain equipment used

28    by MRT transmits.

Greenan,
Peffer,
Sallander &
Lally LLP

8

45.     Burgess also wanted Youden to disclose the types of antenna used by MRT in its devices.

### iv.    Discussing MRT's Technology With Competitors.

46.     In or about the fall of 2007, Martone spoke with Jay Kruse ("Kruse"), the principal RF engineer at Tropos Networks, Inc. ("Tropos"). Tropos is a competitor of MRT in some aspects of wireless technology and in the marketplace. During the conversation, Martone was advised that Burgess had spoken with the Chief Technology Officer ("CTO") of Tropos about the wireless equipment used by MRT.

47.     Shortly afterwards, Martone met with Burgess at the offices of MRT. During the meeting, Martone asked Burgess whether he knew anything about Tropos. In response, Burgess admitted speaking with individuals at Tropos, but claimed that nothing in the discussion was "relevant to MRT." Burgess mentioned, however, that Tropos was interested in the mapping and surveying techniques used by MRT. Burgess further stated that he revealed to Tropos the hardware used by MRT to conduct its mapping and surveying techniques and how the software for such hardware works.

48.     During the conversation, Burgess further stated that he disclosed to Tropos how MRT monitors wireless networks through the use of specific, sensitive techniques and components. These techniques employ devices available only through government suppliers and MRT developed and provides the software and algorithms necessary for these devices to operate. Burgess and Kestrel had access to this software during the time they were consultants for Martone and MRT.

### F.    The Formation of Range Networks, Inc.

49.     After MRT developed a working BTS, Burgess formed Range. Plaintiffs are informed and believe that Range was incorporated in or about May 2007.

50.     In the fall of 2007, Burgess advised Martone that he and others had formed Range and that the company's business plan centered on a BTS that was based on the same GSM standard as used in the MRT-BTS. Burgess also stated that he preferred to "leverage" his work at MRT and on the "GSM standard," rather than develop new standards or technologies for the

1    BTS to be produced by Range.

2        51.    During the meeting, Burgess described a demonstration of the Range device

3    which he proposed to give to potential investors in Range. The proposed demonstration was

4    intended to convince investors of the viability of Range's business plan. Burgess further stated

5    that the demonstration would duplicate the functions of the MRT-BTS.

6        52.    The proposed demonstration would also showcase the voice processing capability

7    of the Range BTS. This capability is an aspect of the MRT-BTS and Burgess worked on the

8    voice processing function of the MRT-BTS during the time he served as a consultant for MRT.

9        53.    The proposed demonstration would also duplicate demonstrations which plaintiffs

10   had earlier given to investors and customers of MRT.

11       54.    At the meeting, Burgess stated that he had also spoken with venture capitalists,

12   "angel" investors and others about providing cellular service to underdeveloped countries

13   through a BTS to be produced by Range. Burgess further stated that the investors with whom he

14   had spoken did not believe his representation that Range could produce a working BTS in six

15   months. Burgess further stated to Martone that MRT was proof that the investors were wrong.

16       55.    Burgess further stated that he planned to "raid" employees from other companies

17   as soon as he received funding from investors. One of the companies which Burgess intended to

18   "raid" was Rosum Corporation ("Rosum").

19   **G.    The Attempts by Burgess to Discover Further Information About MRT.**

20       56.    Approximately a week later, Burgess questioned Youden and Martone about the

21   "coverage" of the MRT-BTS. The term "coverage" means the area of telephone transmission

22   that is captured by a BTS. It is the footprint created by a cell phone tower.

23       57.    Burgess asked Youden and Martone about the height required of a cell tower to

24   obtain a specific footprint size. Burgess also wanted to know the amount of electricity required

25   to power a cellular telephone tower and other information regarding the creation of a cellular

26   network. When asked by Youden whether he was building a GSM-based BTS, Burgess

27   responded "Yes."

28

Greenan,
Peffer,
Sallander &
Lally LLP

10

**H.    The Further Statements of Burgess.**

58.    Later, Martone had a long meeting with Burgess.  During the meeting, Martone made clear that Range was not authorized to use any technology or intellectual property owned or developed by MRT.

59.    In the meeting, Burgess stated that the BTS work which he performed for MRT would be useful to him and Range.  Burgess further stated that when he asked the interim CEO of Range, Glen Edens ("Edens"), about a potential conflict in interest in the work which Burgess performed for MRT and that which he was doing for Range, Edens responded "so what?"

60.    Burgess also admitted that a "reuse" of the software developed by MRT might be necessary in the development of a BTS for Range.  Burgess then expressed an interest in obtaining permission from MRT to use its software.

61.    During this meeting, Burgess also expressed his interest using the hardware and software developed by MRT.  Among the intellectual property which Burgess sought to use was:

    A.    An analog RF transceiver (transmitter and receiver) for cellular bands;

    B.    A digital transceiver (transmitter and receiver);

    C.    Mechanical system level hardware;

    D.    Control software;

    E.    Computers which MRT had modified for its use; and

    F.    Algorithms.

**I.    The Disclosure by Burgess of Sensitive, Unclassified Information of MRT.**

62.    MRT has contracts with the United States government and there are specific rules and regulations that govern these contracts.  There are also rules and regulations which govern the disclosure of sensitive, unclassified information possessed by MRT and its subcontractors.  Burgess is aware of the obligations and agreed to abide by them.  Burgess, however, has failed to do so.

63.    Specifically, plaintiffs are informed and believe that Burgess has approached businesses and investors and engaged in technical discussions about:

    A.    The development, use and employment of the MRT-BTS;

B.    The intelligence applications of the MRT-BTS;

C.    The commercial applications of the MRT-BTS; and

D.    Aspects of the software, hardware, algorithms and system architecture that MRT has developed and uses in its devices, including the MRT-BTS.

**J.    The Trade Secrets and Intellectual Property Taken By Burgess and Kestrel.**

64.    Burgess ended his consulting relationship with Martone and MRT in or about October 2007.  Under paragraph 10 of the Proprietary Agreement, Burgess was required to either return plaintiffs' intellectual property or certify that such intellectual property was destroyed.

65.    On October 15, Burgess advised Martone by electronic mail that he had removed all MRT software and algorithms from his laptop computer.  Burgess also represented that he had removed all MRT trade secrets and intellectual property from the memory and disc drives of Kestrel.

66.    Notwithstanding these representations, Burgess did not return the computer discs containing the software and algorithms of MRT until mid December 2007.  Moreover, the discs that were returned did not contain all of the software and algorithms taken by Burgess.

67.    Burgess also did not return a laptop computer that contained the software code for the MRT-BTS until December 2007.  The laptop was owned by MRT.

68.    In March 2008, Burgess revealed photographs that he had taken of MRT hardware in or about May 2006.  Burgess, however, has not returned these photographs to MRT.

69.    In April 2008, Burgess provided MRT with more computer discs.  These discs contained mapping data and imagery of the earth which MRT used to develop the geo-location aspect of the MRT-BTS (the "Mapping Data Project").  The Mapping Data Project had been completed approximately two years earlier.

**i.    The Downloading of Source Code, Computer Files and Software.**

70.    MRT has examined the servers, databases and log files of its computers.  This examination revealed that Burgess has downloaded such MRT intellectual property as:

A.  MRT source code;

B.  Computer files containing sensitive and proprietary information;

C.   Software programs that MRT had developed or modified using proprietary methods;

D.   Graphical User Interfaces developed by MRT which reveal proprietary and sensitive functions of the MRT-BTS; and

E.   Databases containing the use and activity of the MRT-BTS and which contain sensitive and proprietary information.

71.    The material downloaded by Burgess contained intellectual property that was not needed by Burgess to perform his work.  The downloading of plaintiffs' intellection property occurred on numerous dates and was done without authorization and exceeded the authorization given to Burgess by plaintiffs.

72.    Except for the information in the computer discs received from Burgess, the intellectual property which Burgess downloaded has not been returned.

**ii.    The Unauthorized Transmission of Intellectual Property to Jon Metzler.**

73.    Examination of MRT's computers further revealed that in March 2007, Burgess sent an electronic message to one of his business associates, Jon Metzler ("Metzler").  The email contained an attachment which consisted of an audio recording of Burgess transmitting his voice over a working MRT-BTS.

74.    Burgess was not authorized to disclose to any person not affiliated with MRT information regarding the status, condition or performance of any MRT device.

75.    Moreover, Metzler was not authorized to receive any information about any product or device created by MRT.

**iii.    The Unauthorized Transmission of Intellectual Property to Raffi Sevlian.**

76.    Burgess and Kestrel also transmitted plaintiffs' intellectual property to an individual named Raffi Sevlian ("Sevlian").  The intellectual property transmitted to Sevlian included:

A.   Source code and algorithms developed by MRT for use in its BTS; and

B.   Source code and algorithms developed by MRT for use in other devices produced by MRT.

77.    Martone and MRT are informed and believe that Burgess transmitted their intellectual property to Sevlian for the purpose of developing a database of MRT's intellectual property.

78.    The transmission of plaintiffs' intellectual property to Sevlian was done without the knowledge, approval or consent of Martone and MRT.

**iv.    The Unauthorized Transmission of Intellectual Property to Other Consultants and the Fraudulent Billing of Burgess and Kestrel.**

79.    Examination of the computers of MRT and the disc returned by Burgess further revealed that unbeknownst to plaintiffs, Burgess and Kestrel had used software consultants other than Burgess to review MRT intellectual property and create the software requested by plaintiffs.

80.    Burgess and Kestrel did so notwithstanding that paragraph 4 of the Proprietary Information Agreement provides:

> All Proprietary information forwarded by either party to the other party shall be received only by Burgess for himself and Martone for himself, or a substitute designated in writing for the named individual, who shall confirm in writing the receipt of such information.

81.    Neither Martone nor MRT authorized anyone other than Burgess himself to review any intellectual property of MRT. Additionally, neither Martone nor MRT authorized anyone other than Burgess to draft the software requested by MRT.

82.    Plaintiffs are informed and believe that the software consultants used by Burgess and Kestrel were given access to all of the software developed by plaintiffs for the MRT-BTS. Plaintiffs, however, never authorized Burgess or Kestrel to disclose or transmit their intellectual property to such consultants.

83.    Plaintiffs are further informed and believe that the software consultants used by Burgess and Kestrel to perform work for MRT had substantially less education, training and experience than did Burgess. Burgess and Kestrel nonetheless billed the work performed by these persons at the same rate charged by Burgess. Burgess and Kestrel did so notwithstanding their failure to disclose such facts to either Martone and MRT.

### v.    The Discovery of Photographs of MRT Equipment.

84.    In October 2007, Burgess forwarded an electronic message to Martone. The text of the message stated: "I liked Mike's equipment bag and took a photo to remind myself to look for one." Attached to the email was a photograph of a brown carrying case. The case which Burgess photographed, however, contained the components used by MRT to assemble its BTS.

85.    The photograph sent to Martone was taken in the software laboratory of MRT. Among other things, the photograph reveals the circuit boards developed by MRT for its BTS. The photograph also contains a date stamp of May 31, 2007.

86.    Plaintiffs have learned that other photographs of MRT hardware have been taken by Burgess. Specifically, in March 2008, Burgess disclosed to Martone two color photographs of hardware developed by MRT hardware. These photographs were taken after a shield protecting access to a circuit board had been removed. This alteration reveals the circuitry to the MRT-BTS. The photographs were taken by Burgess and are dated May 2006.

87.    Burgess also disclosed to Martone two color photographs of MRT testing equipment. These photographs reveal, in analogue form, the digital transmissions of the MRT-BTS. These photographs were taken by Burgess and are dated March 2006.

88.    Burgess was not authorized to taken any photographs of any hardware, software of MRT. Nor was Burgess authorized to photograph any analogue display of any transmissions of the MRT-BTS.

### K.    The Use of Plaintiffs' Intellectual Property by Range Networks, Inc.

89.    Plaintiffs are informed and believe that Burgess, Kestrel and Range are using the photographs taken by Burgess to seek funding for a BTS to be produced by Range.

90.    Plaintiffs are further informed and believe that Burgess, Kestrel and Range are using the intellectual property of MRT, including its software and hardware, to solicit funding from investors to develop a BTS to be produced by Range.

91.    Plaintiffs are further informed and believe that unbeknownst to them, Burgess and Kestrel have employed software consultants to develop software for Martone and MRT. Plaintiffs are further informed and believe that these same consultants are employed by Range to

develop identical or equivalent software for Range. Neither Martone nor MRT have authorized Burgess or Kestrel to use or employ consultants other than Burgess to develop software for plaintiffs.

92.    Plaintiffs are further informed and believe that the MRT intellectual property transmitted by Burgess and Kestrel to these consultants is being used by Range and others to produce a BTS and other devices that will compete with those developed and produced by Martone and MRT.

WHEREFORE, Martone and MRT pray for judgment as follows:

## FIRST CLAIM FOR RELIEF
*(Violation of the Computer Fraud and Abuse Act against Burgess and Kestrel)*

93.    Martone and MRT incorporate paragraphs 1 through 92 herein.

94.    The computers, servers and other electronic databases of MRT (collectively, the MRT computer") are used in interstate and foreign commerce and communication. The MRT computer is therefore a "protected computer" as defined by 18 U.S.C. section 1030(e)(2)(B), a provision of the Computer Fraud and Abuse Act of 1986, as amended, 18 U.S.C. section 1030(a) *et seq.* (the "Act") .

95.    Burgess and Kestrel have knowingly and with the intent to defraud accessed the MRT computer without authorization and by exceeding the authorization provided to them by plaintiffs, and have thereby obtained something of value. Through such conduct, Burgess and Kestrel acted in violation of 18 U.S.C. section 1030(a)(4).

96.    As a result of the unlawful conduct of Burgess and Kestrel, Martone and MRT have incurred a "loss," as defined by 18 U.S.C. section 1030(e)(11), of at least $5,000 during a 1-year period, thereby satisfying the requirements of 18 U.S.C. section 1030(a)(5)(b)(i).

97.    Pursuant to 18 U.S.C. sections 1030(g), Martone and MRT seek compensatory damages and injunctive and other equitable relief for the harm caused to them by Burgess and Kestrel.

Greenan,
Peffer,
Sallander &
Lally LLP

16

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

98.     Martone and MRT bring their claim for relief under the Act within two years of the date of the discovery of the damage and loss caused by Burgess and Kestrel.

WHEREFORE, Martone and MRT pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
*(Violation of the California Uniform Trade Secrets Act against Burgess, Kestrel and Range)*

99.     Martone and MRT incorporate paragraphs 1 through 98 herein.

100.    The intellectual property described above constitutes trade secrets of Martone and MRT as defined by California Civil Code section 3426.1(d).  The trade secrets of Martone and MRT have independent economic value from not being generally known to the public.  These trade secrets are also not known to third parties who might otherwise be able to obtain economic value from them.

101.    Secrecy of such trade secrets has provided and continues to provide Martone and MRT with a commercial advantage over its current and potential competitors.  Martone and MRT therefore have made efforts that are reasonable under the circumstances to protect the confidentiality and secrecy of their trade secrets.

102.    Burgess and Kestrel are under a duty to kept secret the trade secrets and intellectual property of Martone and MRT and not to disclose such information other than for the benefit of Martone and MRT.

103.    Martone and MRT are informed and believe that Burgess and Kestrel have disclosed their trade secrets to Range and others.  Plaintiffs are further informed and believe that Burgess, Kestrel and Range have used the trade secrets of Martone and MRT to develop a BTS device to compete with the MRT-BTS.

104.    Range and the other recipients of plaintiffs' trade secrets know, or have reason to know, that the trade secrets disclosed to them by Burgess and Kestrel were acquired by improper means or were acquired without the consent of Martone and MRT.

105.    The actions of Burgess, Kestrel and Range constitute misappropriation of plaintiffs' trade secrets as set forth in section 3426.1(b) of the California Civil Code.

Greenan,
Peffer,
Sallander &
Lally LLP

17

106.    Martone and MRT have suffered injury and damage as a result of the misappropriation of their trade secrets. Pursuant to section 3426.3(a) of the California Civil Code, Martone and MRT seek compensation for all harm caused by the misappropriation of their trade secrets in an amount subject to proof at trial.

107.    The misappropriation of plaintiffs' trade secrets was willful and malicious and was made with the intent to harm and injure Martone and MRT. Martone and MRT therefore seek exemplary damages against Burgess, Kestrel and Range as permitted by section 3426.3(c) of the California Civil Code.

108.    The natural, probable and foreseeable result of the misappropriation of plaintiffs' trade secrets will be to unjustly enrich Burgess, Kestrel, Range and others by enabling them to develop and market devices which compete with those of MRT and by providing Burgess, Kestrel, Range and others with undeserved competitive advantages. Pursuant to section 3426.3(b) of the California Civil Code, Martone and MRT seek recovery for the unjust enrichment caused by the misappropriation of Burgess, Kestrel and Range.

109.    Martone and MRT are informed and believe that Burgess, Kestrel and Range are using and/or disclosing plaintiffs' trade secrets. Absent an injunction barring such conduct, Burgess, Kestrel and Range will continue to use and disclose plaintiffs' trade secrets to compete unfairly with plaintiffs and continue to injure and damage plaintiffs. Unless Burgess, Kestrel and Range are restrained and enjoined, Martone and MRT will have no adequate remedy at law and money damages cannot fully compensate plaintiffs for the injury and damage caused by defendants' conduct.

WHEREFORE, Martone and MRT pray for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
*(Common Law Misappropriation of Trade Secrets against Burgess, Kestrel and Range)*

110.    Martone and MRT incorporate paragraphs 1 through 109 herein.

111.    The intellectual property described above constitutes trade secrets of Martone and MRT. These trade secrets have independent economic value from not being generally known to

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

1   the public.  Prior to defendants' misappropriation, these trade secrets were also not known to

2   third parties who might otherwise obtain economic value from them.

3       112.    Secrecy of such trade secrets has provided and continues to provide Martone and

4   MRT with a commercial advantage over its potential competitors.  Plaintiffs have therefore

5   made, and continue to make, reasonable and diligent efforts to protect the confidentiality and

6   secrecy of their trade secrets.

7       113.    Burgess and Kestrel are under a duty to kept secret the trade secrets and

8   intellectual property of Martone and MRT and not to disclose such information other than for the

9   benefit of Martone and MRT.

10      114.    Martone and MRT are informed and believe that Burgess and Kestrel have

11  disclosed their trade secrets to Range and others.  Plaintiffs are further informed and believe that

12  Burgess, Kestrel and Range have used the trade secrets of Martone and MRT to develop a BTS

13  device to compete with the MRT-BTS.

14      115.    Range and the other recipients of plaintiffs' trade secrets know, or have reason to

15  know, that the trade secrets disclosed to them by Burgess and Kestrel were acquired by improper

16  means or were acquired without the consent of Martone and MRT.

17      116.    As a result of the conduct of Burgess, Kestrel and Range, Martone and MRT have

18  been injured and damaged in an amount to be proven at trial.  Martone and MRT are also entitled

19  to restitution and disgorgement of any profits resulting from defendants' misappropriation of

20  plaintiffs' trade secrets.

21      117.    The misappropriation of plaintiffs' trade secrets was willful and malicious and

22  was made with the intent to harm and injure Martone and MRT.  Martone and MRT therefore

23  seek exemplary damages against Burgess, Kestrel and Range.

24      WHEREFORE, Martone and MRT pray for judgment as set forth below.

25

26                          **FOURTH CLAIM FOR RELIEF**
                    *(Fraud and Deceit against Burgess and Kestrel)*
27

28      118.    Martone and MRT incorporate paragraphs 1 through 117 herein.

Greenan,
Peffer,
Sallander &                                    19
Lally LLP

119.    Burgess and Kestrel promised, represented and agreed to protect the trade secrets and intellectual property of Martone and MRT. Burgess and Kestrel further promised, represented and agreed that they would bill plaintiffs only for the services provided by Burgess.

120.    In reliance on these promises, representations and assurances, Martone and MRT provided Burgess and Kestrel with access to their trade secrets and intellectual property necessary for Burgess to provide his software consulting service to plaintiffs.

121.    The promises, representations and agreements made by Burgess and Kestrel were false and defendants knew them to be false when they were made. The promises, representations and assurances of Burgess and Kestrel were also made with the intent to deceive Martone and MRT and with the intent to willfully, maliciously and oppressively injure plaintiff.

122.    As a consequences of the promises, representations, assurances and conduct of Burgess and Kestrel, Martone and MRT have been injured and have suffered damage in an amount which will be proven at the trial of this action.

WHEREFORE, Martone and MRT pray for judgment as set forth below.


**FIFTH CLAIM FOR RELIEF**
*(Breach of Contract against Burgess and Kestrel)*

123.    Martone and MRT incorporate paragraphs 1 through 122 herein.

124.    Martone and MRT have complied with all of the terms and conditions of the Proprietary Agreement and have performed all of the terms of the agreement except for those which have been excused by the conduct of Burgess and Kestrel.

125.    Kestrel has acquired the consulting work performed by Burgess for plaintiffs. Burgess has also performed his consulting services for MRT through Kestrel. Kestrel has therefore assumed the obligations and duties in the Proprietary Agreement and Addendum.

126.    Burgess and Kestrel have breached the terms of the Proprietary Agreement by, among other things, failing to protect the trade secrets and intellectual property of Martone and MRT; disclosing the trade secrets of Martone and MRT to others including Range and Tropos; and using consultants other than Burgess to develop software for plaintiffs.

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

127    As a result of the breaches of the Proprietary Agreement by Burgess and Kestrel, Martone and MRT have been damaged in an amount which will be proven at the trial of this action.

WHEREFORE, Martone and MRT pray for judgment as set forth below.

### SIXTH CLAIM FOR RELIEF
*(Breach of the Covenant of Good Faith and Fair Dealing against Burgess and Kestrel)*

128.    Martone and MRT incorporate paragraphs 1 through 127 herein.

129.    The Proprietary Agreement contains an implied covenant of good faith and fair dealing which requires that neither party to the agreement take action designed to deprive the other of its rights under the agreement.

130.    Through the acts, conduct and omissions set forth above, Burgess and Kestrel have breached the implied covenant of good faith and fair dealing and have deprived Martone and MRT of the benefits of the Proprietary Agreement.

131.    As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing, Martone and MRT have been damaged in an amount to be proven at the trial of this matter.

WHEREFORE, Martone and MRT pray for judgment as set forth below.

### SEVENTH CLAIM FOR RELIEF
*(Violation of the Unfair Competition Law against Burgess, Kestrel and Range)*

132.    Martone and MRT incorporate paragraphs 1 through 131 herein.

133.    The conduct of Burgess, Kestrel and Range as set forth above constitutes unlawful, fraudulent and/or unfair business practices which gives defendants a competitive advantage and which violates section 17200 *et seq.* of California Business and Professions Code section 17200.

134.    As a consequence of the unlawful, fraudulent and/or unfair business practices of defendants, Burgess, Kestrel and Range have derived economic benefit from the possession and

Greenan,
Peffer,
Sallander &
Lally LLP

21

1    use of the trade secrets and intellectual property wrongfully obtained from Martone and MRT.

2    WHEREFORE, Martone and MRT pray for judgment as set forth below.

3    **EIGHTH CLAIM FOR RELIEF**
4    *(Unjust Enrichment)*

5    135.    Martone and MRT incorporate paragraphs 1 through 134 herein.

6    136.    By engaging in the conduct described above, Burgess, Kestrel and Range have

7    benefitted and continue to benefit from their wrongdoing and have been unjustly enriched by

8    reaping the benefits of their unlawful activities to the damage and irreparable harm of Martone

9    and MRT.

10    137.    The circumstances are such that it would be inequitable for Burgess, Kestrel and

11    Range to retain the benefits received from the actions described without repaying the lost value

12    to Martone and MRT.

13    WHEREFORE, Martone and MRT pray for judgment as set forth below.

14

15    **NINTH CLAIM FOR RELIEF**
16    *(Declaratory Relief against Burgess, Kestrel and Range)*

17    138.    Martone and MRT incorporate paragraphs 1 through 137 herein.

18    139.    A controversy exists regarding the rights and duties of plaintiffs and Burgess and

19    Kestrel with respect to the Proprietary Agreement. To resolve this controversy, Martone and

20    MRT request an order declaring that Burgess and Kestrel have breached the Proprietary

21    Agreement.

22    140.    A controversy further exists regarding the use by Burgess, Kestrel and Range of

23    the trade secrets and intellectual property of Martone and MRT. To resolve this controversy,

24    Martone and MRT request an order declaring that Burgess, Kestrel and Range have wrongfully

25    acquired and have wrongfully used the trade secrets and intellectual property of plaintiffs.

26    WHEREFORE, Martone and MRT pray for judgment as set forth below.

27

28

Greenan,
Peffer,
Sallander &
Lally LLP

22

1
2
3

### TENTH CLAIM FOR RELIEF
*(Injunctive Relief against Burgess, Kestrel and Range)*

4

5        141.    Martone and MRT incorporate paragraphs 1 through 140 herein.

6        142.    Defendants have misappropriated the trade secrets and intellectual property of

7    Martone and MRT.

8        143.    In the absence of an injunction prohibiting Burgess, Kestrel and Range from using

9    and profiting from the use of plaintiffs' trade secrets and intellectual property, plaintiffs will

10   have no adequate remedy at law.

11       144.    Accordingly, plaintiffs seek an injunction prohibiting Burgess, Kestrel, Range and

12   their employees and agents from using any trade secrets and intellectual property of plaintiffs.

13       WHEREFORE, Martone and MRT pray for judgment as set forth below.

14
15
16       Martone and MRT therefore pray for judgment as follows:

17       1.    That judgment be entered in favor of plaintiffs and against Burgess, Kestrel and

18   Range on all claims for relief asserted herein;

19       2.    That Martone and MRT be awarded compensatory damages according to proof at

20   trial, together with prejudgment interest at the maximum legal rate;

21       3.    That Martone and MRT be awarded exemplary damages according to proof at

22   trial in accordance with sections 3426.3(c) and 3294 of the California Civil Code;

23       4.    That Burgess, Kestrel and Range be compelled to disgorge all profits accrued

24   from the wrongful conduct alleged herein;

25       5.    That Burgess, Kestrel and Range be required to make restitution to Martone and

26   MRT;

27       6.    That Martone and MRT be awarded cost of suit and attorneys' fees pursuant to

28   section 3426.2 of the Civil Code; and

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

7.    For such other and further relief as the Court deems just and proper.

Dated: May 8, 2008

GREENAN, PEFFER, SALLANDER & LALLY LLP

By: _____
Kevin D. Lally
Attorneys for Plaintiffs
MASSIMILIANO MARTONE and
MARTONE RADIO TECHNOLOGY, INC.

1

### DEMAND FOR JURY TRIAL

2      Pursuant to the Seventh Amendment of the United States Constitution, Rule 38(b) of the

3 Federal Rules of Civil Procedure and Civil Local Rule 3-6(a), plaintiffs Massimiliano Martone

4 and Martone Radio Technology, Inc. each demand a trial by jury of all issues and claims for

5 relief so triable.

6

7 Dated: May 8, 2008

8                                 GREENAN, PEFFER, SALLANDER & LALLY LLP

9

10             By: _____

11                      Kevin D. Lally

12                      Attorneys for Plaintiffs

                     MASSIMILIANO MARTONE and

13                      MARTONE RADIO TECHNOLOGY, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   F:\LIT\Martone Technology (MRT)\Martone v. Burgess et al - USDC\Pleadings\Complaint 5-7-08-V2 (clean).doc

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT OF MASSIMILIANO MARTONE AND MARTONE RADIO TECHNOLOGY, INC.

Exhibit 1

## PROPRIETARY INFORMATION AGREEMENT
between
Massimiliano "Max" Martone
and
David Burgess

This Agreement is made and effective this 28 th day of Sept , 2004 by and between Massimiliano "Max" Martone, having a place of business at 2451, Taylor Way, Antioch, California 94531, (hereinafter referred to as "Martone") and David Burgess, having a place of business at 2253, Fox Glen Drive, Fairfield, CA (hereinafter referred to as "Burgess").

**WHEREAS** the parties desire to provide a mechanism and capability for the exchange of Proprietary Information concerning the GSM project.

**NOW THEREFORE** in consideration of the mutual covenants herein contained, the parties do agree as follows:

1.    Pursuant to this Agreement and in support of the purpose set forth above, it may be appropriate for the parties to exchange technical, financial or other competitive-sensitive information, some of which may be deemed to be proprietary to the disclosing party. Such disclosure shall be subject in each instance to the concurrence of both parties. Burgess and Martone agree that any such exchange of Proprietary Information between them shall be subject to the terms of this Agreement and, if technical data, to the Export Control laws of the USA under the appropriate License.

2.    "Proprietary Information" shall be construed to mean any documented information originated by or peculiarly within the knowledge of the disclosing party or its suppliers, which information is appropriately marked or otherwise clearly identified in writing as being proprietary at the time of its disclosure to the receiving party. If such information is disclosed in other than tangible form (e.g., orally, visually, electronically or like manner), that information must be identified as Proprietary at the time of disclosure and summarized and submitted in writing to the recipient by the disclosing party within thirty (30) calendar days

from the date of disclosure. Information which falls under one of the following exceptions may be considered technical data for the purposes of the Export Control Laws, but shall not be considered to be Proprietary Information:

    (a)  Information not appropriately marked or otherwise clearly identified as being Proprietary at the time of the disclosure;

    (b)  Information, which at the time of such disclosure by the disclosing party, was in the public domain;

    (c)  Information which, after such disclosure by the disclosing party, becomes part of the public domain by publication or otherwise, without violation of confidence by the receiving party;

    (d)  Information, which the receiving party can show, was in its possession at the time of such disclosure by the disclosing party;

    (e)  Information which, after such disclosure by the disclosing party, is disclosed to the receiving party by a third party without violation of an obligation of confidence to the disclosing party;

    (f)  Information independently developed by the receiving party;

    (g)  Information disclosed by the disclosing party to the United States government and subsequently properly disclosed to the general public;

    (h)  Information which is obtainable from a commercially available product; or

    (i)  Information which, although originally disclosed as proprietary, has been in the possession of the receiving party for five or more years if technical information, and five or more years if financial or non-technical competitive-sensitive information.

3.  With regard to Proprietary Information disclosed by either party, the receiving party

agrees that until such information comes within the earliest one of the conditions listed in Paragraph 2(a) through Paragraph 2(i) above, such party shall not:

    (a)   use such information for purposes other than to advance the purpose set forth above; or

    (b)   disclose such information to persons other than those of its employees or consultants having a direct need to know and use such information, unless further disclosure is approved in writing signed by an authorized representative of the disclosing party.  Disclosure of such information to any employee or consultant shall be subject to the Export Control Laws and also to all restrictions set forth herein, and the employee or consultant shall agree in writing to be bound thereby.  The disclosing party shall be notified in writing of the name and address of any consultant to whom Proprietary Information is disclosed.

    4.   All Proprietary Information forwarded by either party to the other party shall be received only by Burgess for himself and Martone for himself, or a substitute designated in writing for the named individual, who shall confirm in writing the receipt of such information.

    5.   Notwithstanding the foregoing but still subject to the Export Control Laws of the USA, a receiving party shall not be liable for:

    (a)   Disclosure of Proprietary Information if compelled by judicial or other governmental action, provided that the receiving party notifies the disclosing party of the need for such disclosure promptly after such need becomes known;

    (b)   Unauthorized disclosure of such information, by employees and consultants of the receiving party, provided the receiving party protects such information to the extent normally used in safeguarding its own proprietary information of the same type and once aware of an unauthorized disclosure promptly acts to mitigate any effect thereof and to restrict further disclosure of the Proprietary Information; or

(c) Use or disclosure after it has come within the earliest one of the exceptions in Paragraph 2(a) through Paragraph 2(i) above.

6.   Exchange of Proprietary Information between the parties is contemplated from the effective date of this Agreement until the date of termination of this Agreement.

7.   Each party warrants that it has the right to make the disclosures under this Agreement. **NO OTHER WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT.   ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS".**

8.   No other rights or obligations other than those expressly recited herein are to be inferred from this Agreement with respect to patents, inventions, copyrights and information.

9.   It is agreed that no license under any patents, copyrights, trademarks, trade secrets or other intellectual property of either party is granted by this Agreement or by any disclosure of Proprietary Information hereunder, and any such information which may be transmitted or exchanged by the respective parties shall not constitute any representation, warranty, assurance, guarantee, or inducement by either party to the other with respect to the infringement of patents or other rights of third parties.

10. The termination of this Agreement shall not affect either party's obligations and rights hereunder with respect to Proprietary Information disclosed prior to termination.  Upon termination, all written information and materials, and all copies thereof, except for a single memorial copy maintained by the cognizant Legal organization of the recipient party, shall be either returned to the disclosing party or certified as destroyed by the recipient party to the disclosing party.

11. If the parties hereinafter enter into a contract which requires or permits use or disclosure of Proprietary Information disclosed pursuant to this Agreement, the Terms of such contract requiring or permitting such use or disclosure shall to that extent, supersede the provisions of this Agreement.

12. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California exclusive of its Conflicts of Law rules.

13. This Agreement contains the entire understanding between the parties and supersedes all prior and collateral communications and understandings between Martone and Burgess relative to the protection of Proprietary Information exchanged for the purpose set forth above. No change or addition to any provision hereof shall be binding unless in writing and signed by authorized representatives of both parties. This Agreement shall apply in lieu of, and notwithstanding the language of, any specific legend or statement associated with any particular information or data exchanged, and the obligations of the parties shall be determined exclusively by the aforementioned terms and conditions.

14. Neither Party shall assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party. Except as provided hereafter, any attempted assignment or transfer by any Party, or occurring by virtue of the purported operation of law, shall be void. A change of corporate name by a Party, merger or other corporate reorganization (provided that the Party remains the surviving entity) or the sale by a Party of all or substantially all of its assets shall not be deemed an assignment or transfer hereunder.

15. This Agreement, unless extended by the parties in writing, shall terminate five years from the date first above written, provided, however, that either party may terminate this Agreement before that date by fifteen (15) calendar days written notice to the other party. No termination shall affect either party's obligations and rights herein with respect to information disclosed prior to termination.

## TERMS & CONDITIONS
### ADDENDUM

Burgess agrees and understands that the work performed is work for hire and as such Burgess agrees that Martone will be the owner of all inventions, technology, designs, algorithms, work of authorship, mask works, technical information, computer software, business information, and other information conceived, developed or otherwise generated. Burgess agrees to assist Martone at Martone's request and expense, in obtaining, maintaining and enforcing patent and other intellectual property protection.

MARTONE INFORMATION:

Information provided by Martone to Burgess remains property of Martone. Burgess agrees to comply with the terms of any confidential disclosure agreement. Burgess agrees not to use Martone-provided information for any purpose except to perform contract work related to the GSM project.

INDEPENDENT CONTRACTOR:

The parties hereto are independent contractors. This Agreement shall not be construed to have established a joint venture, partnership or agency relationship. Neither party shall have the power or authority to represent or commit the other. Nothing herein shall be construed as providing for the sharing of profits or losses arising out of the parties.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement by signature of their respective authorized representatives as of the date first above written.

Massimiliano (Max) Martone

Signature _Max Martone_                    Dated: _28 Sept 2004_

David Burgess

Signature _____                    Dated: _28 Sep 2001_